Simons, J.
(dissenting in part). I cannot concur in the majority’s remarkably indulgent determination that defendants were merely emulating the practices of "reputable financial institutions” (majority opn, at p 121), and that Sentry’s use of Chemical Bank’s money for esoteric investment schemes or to secure favored loan conditions for itself amounted to little more than a noncriminal financial "joyride” (majority opn, at pp 121, 125). Investing the "float” may be legal in a debtor-creditor relationship, but a bailee for hire undertakes to protect and preserve the bailor’s property with *131 only such use of the property as the parties to the bailment agree upon. The bailee does not have carte blanche to risk the bailor’s property for its own gain. There is no dispute in this case that Chemical Bank bailed its property to Sentry intending that Sentry securely store the funds on is premises, safely transfer them to the bailor’s customer, Waldbaum, or perform related services for Chemical, such as coin counting, before depositing the funds in Chemical’s account at the Federal Reserve Bank. Defendants not only performed those services badly, but while doing so they lost thousands of dollars of Chemical’s funds and risked the loss of millions more by these illegal schemes and use of their bailor’s insurance funds. I agree with the two Grand Juries that found sufficient evidence that defendants’ conduct was criminal, and I would sustain the indictments.
My differences with the majority are more fundamental than the significance attributed to the evidence, however. In my view, the majority and the courts below have given an overly restrictive interpretation to the applicable statutes. Thus, while I agree with the court’s findings that the People have failed to preserve their claimed procedural errors, and with the rulings discussed in parts I., III. and VII. of the majority opinion, I disagree with its interpretation of the pertinent statutes and the disposition of the counts of the indictment charging larceny involving the repurchase agreements (except as to defendant Finnerty) discussed in part IV., the compensatory balance scheme discussed in part V., and the misappropriation of insurance proceeds discussed in part VI. I, therefore, dissent.
I
Turning first to the larceny counts, the majority concedes, as to the repurchase agreement scheme and compensatory balance scheme, that the evidence supports the Grand Jury’s finding that defendants wrongfully took substantial sums of money from Chemical Bank, the rightful owner, by depositing them in Hudson Valley National Bank and Citibank. Defendants did so by exercising "control over property inconsistent with the continued rights of the owner” (People v Olivo, 52 NY2d 309, 316; People v Alamo, 34 NY2d 453, 457-458). However, the majority does not find sufficient evidence before the Grand Jury of defendants’ larcenous intent in those takings.
*132 The statute provides that the requisite intent for the crime of larceny is an "intent to deprive another of property or to appropriate the same to himself or to a third person” (Penal Law § 155.05 [1] [emphasis added]). The charges involving the repurchase agreements and the compensatory balance scheme rest on the second statutory alternative. The intent to appropriate is defined in several ways, but includes the intent to exercise control over property "under such circumstances as to acquire the major portion of [the] economic value or benefit [of the property]” (Penal Law § 155.00 [4]). I disagree with the majority’s analysis of what constitutes "an intent to appropriate” because it fails to differentiate between a property’s economic value and its economic benefit, and because it mistakenly construes the statutory definition to require a permanent or near permanent appropriation.
The majority finds it necessary that the People show defendants intended to appropriate the economic value of the property although the statute clearly provides a legally sufficient alternative: the appropriation of "a major portion of its economic * * * benefit” (id.), i.e., its ability to make more money. There can be little doubt that defendants intended to use Chemical’s money to their own financial advantage; they invested it with Hudson Valley National Bank, and earned $17,000 in the process, and they also used it to collateralize a loan with Citibank. This evidence was more than sufficient to establish defendants’ intent to acquire the economic benefits of Chemical Bank’s funds within the literal language of Penal Law § 155.00 (4); § 155.05 (1).
The majority also claim that the necessary mens rea for the larceny was lacking because any intent to appropriate the economic benefit of the funds was only the intent to deprive Chemical of its property temporarily or "short term” (majority opn, at p 121). The statute does not specify how long a defendant must intend the appropriation to last, it mferely requires, inter alia, an intent to appropriate "for so extended a period or under such circumstances” as to acquire a major portion of its economic benefit (Penal Law § 155.00 [4] [emphasis added]). Regardless of the limited time involved in diverting the funds involved in the repurchase agreement or the compensatory balance schemes, the defendants appropriated the property "under * * * circumstances” in which they acquired all the economic benefit of the property for the time they held it. That being so, the time and/or the circumstances were sufficient to establish the crime. The majority finds little difference *133 between defendants "short term” use of the bank’s money and "joy-riding” in an automobile. There is a cognizable distinction, however, between using another’s property with the intent to return it and appropriating property to acquire a major portion of its economic benefit — which may never be returned — even if the appropriation is for a short time.
The conclusory assertion of the majority, based upon the Practice Commentary (see, Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 155.00, p 103), that there must be a "purpose * * * to exert permanent or virtually permanent control over the property taken” is not only without legal support, it is contrary to our decisions (see, People v Shears, 158 App Div 577, 582, affd no opn 209 NY 610 [construing Penal Law of 1909 § 1302, now incorporated in Penal Law § 155.05 (2)]; People v Meadows, 199 NY 1, 7), and to the clearly manifested broad sweep of the statute which does not limit the intent to appropriate in terms of the time involved. Rather, the statute defines the crime as an appropriation "under such circumstances” as to acquire the economic benefit of the property.
The general nature of the repurchase agreements is set forth iii the majority opinion, but it has not delineated the five discrete steps taken on each of the more than 40 occasions when defendants transferred Chemical Bank’s money to Hudson Valley. According to the plan between Sentry and Hudson Valley: (1) Sentry would deposit the "fine count” funds into Hudson Valley National Bank’s account at the Federal Reserve; (2) Hudson Valley National Bank would credit the amount of such deposit to the newly created escrow account for Sentry Armored Courier Corporation; (3) the principal in the escrow account was then used to buy A-rated bonds owned by Hudson Valley National Bank and stored at the Federal Reserve; (4) Hudson Valley National Bank would later repurchase these bonds and credit Sentry’s escrow account for the amount of the principal plus interest, less Hudson Valley National Bank’s broker’s fee (the interest was then transferred to another account at Hudson Valley National Bank held in the name of Sentry Investigations Corp.); and finally (5) prior to the expiration of the 72-hour period allotted to Sentry for the "fine counting”, an employee of Sentry Investigations Corp. would telephone Hudson Valley National Bank and authorize a wire transfer of the principal in the escrow account held by Sentry Armored Courier Corp. to Chemical Bank’s account at the Federal Reserve. A wire transfer fee *134 was then deducted from the Sentry Investigations Corp. account.
Chemical had retained Sentry to "fine count” in early 1981; the repurchase agreement scheme started in July 1981 and the contract between Sentry and Chemical was terminated in November of the same year. During the months that the scheme existed, Sentry and Hudson Valley invested approximately $26 million of Chemical’s funds in the repurchase agreements.
The majority makes the unwarranted assumption that, absent production of the written bailment contract, the Grand Jury could not find that Sentry’s acts in these transactions were contrary to its provisions. The speculation is rebutted by testimony not only by the Bank’s officers but by that of Sentry’s own employees as well. Thus, Chemical’s officer, David Williams, testified that when he discovered Sentry was using Chemical’s funds contrary to the Bank’s wishes, in August 1981, he called Mr. Mead, an officer of Sentry, to inquire about it. When Mead gave a patently pretextual excuse that the transfers were dictated by insurance considerations, Williams instructed him that Sentry was to stop these transactions immediately. After the telephone conversation, Williams wrote a letter to Sentry confirming his demand that Sentry stop using Chemical’s money in a manner contrary to the contract. The Grand Jury could reasonably conclude from all of this not only that Sentry’s investment of Chemical’s funds was contrary to the bailment agreement but also, because of the false excuse given by Sentry’s officers, that Sentry knew that to be so. Moreover, the Grand Jury could reasonably assume that Sentry’s confirmed possession of Chemical’s funds was conditioned on its acceptance of this direction and that, had Sentry not indicated that it would discontinue the practice, Chemical would have terminated the agreement. Notwithstanding Chemical’s instructions given by telephone and letter, however, Sentry continued the repurchase scheme until the coin counting contract was terminated in November. This evidence was sufficient, prima facie, to establish defendants’ larcenous intent to appropriate the economic benefit of Chemical Bank’s funds to itself.[1] It is irrelevant that Chemical *135 Bank had no expectation or plan of realizing for itself the interest potential of the moneys during the 72 hours that they were in the hands of Sentry. The statute sets forth no such requirement (see, Penal Law § 155.00 [4]). Nor is it a defense that Chemical Bank’s moneys were intended to be returned— and, in fact, were returned — within the 72 hour time period (see, People v Kaye, 295 NY 9, 13; People v Shears, 158 App Div 577, 582, affd no opn 209 NY 610, supra; People v Meadows, 199 NY 1, 7, supra).
Similarly, there was more than enough evidence to permit the jury to find defendants possessed the requisite larcenous intent when Sentry improperly took Chemical’s funds and deposited them in Citibank to its own credit in its compensatory balance scheme. By so depositing the money, Sentry obtained the major portion of the economic benefit of the funds during the period of the deposit because it, in effect, collateralized its loan from Citibank with Chemical’s money and it also received a reduced interest rate on the loan. This improper transfer and deposit notwithstanding, defendant Fiumefreddo claims that the evidence was insufficient to connect her to the crime, or to establish the requisite intent as to her. Fiumefreddo participated in the transfer of Chemical Bank’s funds to the Citibank account, however, and she signed the account’s signature card. Moreover, she was in charge of Sentry’s money room, and its daily audit reports showed falsely that the $100,000 deposited in the Citibank account was located at Sentry. Fiumefreddo was also the Sentry officer who told the independent auditor that $100,000 of the Chemical Bank shortfall in the Sentry money room deposits was located in a Citibank account. Manifestly, such evidence is sufficient to establish Fiumefreddo’s knowledge of the crime, her connection with it and her requisite larcenous intent.[2]
*136 II
Furthermore, I disagree with the majority’s discussion of the misapplication of property statute as applied to the repurchase agreement indictments against Jennings and the corporate defendants. I would dismiss those indictments, however, because Chemical Bank suffered no loss from these particular transactions (see, Penal Law § 165.00 [2]).
The misapplication of property statute provides that: "1. A person is guilty of misapplication of property when, knowingly possessing personal property of another pursuant to an agreement that the same will be returned to the owner at a future time, he loans, leases, pledges, pawns or otherwise encumbers such property without the consent of the owner thereof in such manner as to create a risk that the owner will not be able to recover it or will suffer pecuniary loss” (Penal Law § 165.00 [1]). The statute apparently has never been judicially construed and the legislative history of the present provision, the substance of which dates back to the 1881 Penal Code, is scant. As now codified, the crime was substantially derived from the Penal Law of 1909 §§ 941 and 1310. The Staff Notes of the Temporary State Commission on the Revision of the Penal Law and Criminal Code (proposed § 170.00) state merely that it "restates existing Penal Law § 941” and that "the specified loaning, leasing and encumbering activity, it should be noted, does not reach the stature of larceny because it does not necessarily entail an intent to 'deprive’ or 'appropriate’ [see, proposed § 160.00 (3), (4); § 160.05 (1)].”
The curious thing about the majority’s decision on this count of the indictment is that it questions whether defendants encumbered Chemical Bank’s property, and thus violated the misapplication statute, yet it finds defendants did commit the greater intrusion of taking the Bank’s property. If the majority finds a "taking” of the property for purposes of the larceny charges (see, majority opn, at p 118), I do not *137 understand why it has any reservations about placing the repurchase agreement transfers within the terms of the statute defining misapplication of funds. In fact, the arrangement did not result in a mere "loan” to Hudson Valley National Bank, as the majority finds (at p 122); rather it resulted in an outright transfer of Chemical Bank’s title to the funds to Hudson Valley’s account at the Federal Reserve, a retransfer by Hudson Valley by crediting the funds to Sentry Armored Courier Corporation’s escrow account, and the use of such funds to purchase from Hudson Valley bonds it owned. There was a taking beyond doubt, as the majority conceded in analyzing the larceny counts.
The majority, finding the transfers were "loans” within the meaning of Penal Law § 165.00 (1) for purposes of discussion, nevertheless finds the statute was riot violated because there was no risk of pecuniary lqss to Chemical as the statute requires. To fail to perceive any risk in these multiple transactions, however, is to blink the realities of modern life. There weré in. all five different transfers by wire and paper entries made during the 72 hours of each repurchase agreement transaction. The potential risk can be inferred from the sheer intricacy of the transactions, and the number of employees at both Sentry and Hudson Valley upon whose accuracy and honesty those transactions depended (to say nothing of the possible risk of computer errors or crimes). Moreover, the claim thqt risk was nonexistent because Chemical Bank’s funds were secured by the A-rated bonds ignores the People’s evidence which established that the bonds were issued to Séntry as security for only a portion of the time that Chemical Bank’s currency was in Hudson Valley Nationál Bank’s account at the Federal Reserve. The funds were held in Sentry’s escrow account during the rest of the time.[3] Finally, *138 the ultimate transfer to return the funds from Sentry’s escrow account to the Chemical Bank account at the Federal Reserve via Hudson Valley depended „ upon, of all things, a simple unverifiable telephone call by a Sentry employee authorizing this transfer.
The Grand Jury was entitled to conclude from the evidence presented concerning the repurchase agreement scheme in particular, and Sentry’s gross mismanagement of funds entrusted to its care, in general, that the repurchase agreement transactions created a risk of loss to Chemical Bank within the meaning of the misapplication statute.
m
Finally, I would affirm the Appellate Division’s order insofar as it reinstated the count charging grand larceny of insurance proceeds. There was sufficient evidence before the Grand Jury to permit it to find that the insurance proceeds belonged to the injured parties and that, contrary to their rights, defendants misappropriated some of the funds to their own use.
The larceny statute provides that, when property is withheld by one person from another person, an "owner” thereof is any person who can establish a right to possession of it superior to that of the withholder (Penal Law § 155.00 [5]). It has been settled law for at least 100 years that a bailee for hire who receives casualty insurance payments for the loss of bailed property holds those payments in trust for the bailor (see, Waring v Indemnity Fire Ins. Co., 45 NY 606; Stillwell v Staples, 19 NY 401, 406-407). We indicated in People v Yannett (49 NY2d 296, 303) that a prosecution will lie against a person who has converted funds for his own use that were given to him specifically in trust for another (see, also, People v Shears, 158 App Div 577, 582, affd no opn 209 NY 610, supra; People v Meadows, 199 NY 1, 7, supra).
In this case, there was evidence that Sentry was contractually obligated to reimburse its clients for their losses, as well as documentary proof that Sentry’s insurer had made the payment in accordance with the proof of loss submitted by those clients. This evidence was sufficient to establish prima facie that the insurance proceeds were paid to Sentry in trust for the bailor-clients who had sustained losses in the robbery, and that defendant intentionally withheld them from the bailor claimants (see, People v Newman, 85 Misc 2d 761, affg *139 80 Misc 2d 975). Given the evidence of a trust existing by operation of law, the alleged conversion by defendant Jennings of a portion of the insurance proceeds for his own or Sentry’s use would support a conviction for larceny by embezzlement (People v Yannett, supra). That a petit jury might resolve the factual issues against the People after trial does not warrant this court in dismissing the indictment.
In conclusion, it is worth noting the concern other branches of our State government have expressed over the enormous increase in large scale white-collar crimes. Thus, in 1986 the State Executive Department recommended comprehensive efforts to "deter the extraordinary increase in sophisticated, economic crime” by proposing the amendment of five different articles of the Penal Law (see, 1986 McKinney’s Session Law News, at A-836-837). The Legislature acted upon these recommendations by enacting several new statutes, including a statute increasing larceny penalties, which expanded, rather than contracted, the methods of fighting white-collar crimes (see, L 1986, ch 515; see also, L 1986, ch 514 [computer offenses]; and L 1986, ch 516 [Organized Crime Control Act]). Apparently the Governor’s staff and the Legislature found the existing larceny statutes adequate to deter and punish peculations, such as those with which defendants are charged, since substantive changes in the provisions of the larceny statutes were not recommended or enacted. In contrast to this concern over the problem, the majority has trivialized the seriousness of defendants’ conduct and interpreted the statutes narrowly, virtually excising important and operative language from them.
Accordingly, I dissent from so much of the majority’s decision as (1) affirms the order dismissing indictments Nos. 4379/ 83 and 370/84 against the Sentry Corporation and Jennings and would reverse and reinstate those indictments, (2) as affirms the order dismissing the larceny counts against Jennings and Fiumefreddo in indictment No. 369/84 and would reverse the order, reinstating those counts and (3) which reverses and dismisses indictment No. 638/83 which charges defendant Jennings with two counts of grand larceny involving the insurance proceeds and would affirm the order reinstating that indictment.
Chief Judge Wachtler and Judges Kaye and Hancock, Jr., concur with Judge Titone; Judge Simons dissents in part and *140 votes to modify in accordance with his separate opinion in which Judges Meyer and Alexander concur.
Order modified and case remitted to Supreme Court, Bronx County, for further proceedings on indictments Nos. 640/83 and 369/84 in accordance with the opinion herein and, as so modified, affirmed.

.The majority’s reliance on Matter of Surrey Strathmore Corp. v Dollar Sav. Bank (36 NY2d 173) is misplaced. That case involved payments made by a mortgagor to a mortgagee to secure the payment of real property taxes on the mortgaged property. It was decided solely on the contractual arrange *135 ments made between the parties and expressly disavowed any reliance on relationships of bailor-bailee, creditor-debtor or the like (see, id., at p 176). Its holding that the mortgagee could have invested the funds was not based upon any generally applicable principles, as the majority suggest (majority opn, at p 120), but solely on the court’s interpretation of the particular contract between the parties.

. There is nothing in the record to establish that defendants Jennings or Fiumefreddo ever challenged the sufficiency of the evidence supporting the indictment charging them with larceny in the compensatory balance scheme, indictment No. 369/84. Defendant Jennings’ motion to dismiss the indictments against him for insufficiency did not include this indictment and defendant Fiumefreddo filed no motion papers at all, but relied entirely on Jennings’ submission. Defendant Jennings’ attorney appeared for oral *136 argument, but Fiumefreddo’s did not. The transcript of the hearing submitted to us contains no oral argument addressed to the sufficiency of the evidence supporting this indictment, suggesting that the Trial Justice relied solely on the motion papers. There is nothing in them which can be even broadly construed as a protest by defendants to the sufficiency of the evidence supporting this indictment and nothing in the trial court’s peremptory dismissal of the charges to indicate that the matter was ever protested. The lack of any conduct challenging this issue can hardly be deemed a "protest” sufficient to preserve a question of law for this court, even under the relaxed standards of new CPL 470.05 (2) (L 1986, ch 798).

.Sentry claims that the use of Chemical Bank’s moneys was risk-free partly because Sentry was credited in the amount of their value as deposited in an escrow account which could not be reached by creditors of Sentry. When arguing against the "compensatory balance scheme” indictments, however, defendants claim that clients’ moneys were lost because Citibank impermissibly invaded an escrow account to satisfy Sentry’s demand loan (see also, majority opn, n 5, at pp 119-120, and n 9, at p 124). Significantly, Hudson Valley National Bank employed Sentry to securely store racing receipts deposited with it by Yonkers Raceway. $225,000 in such receipts were stolen, apparently by an employee of Sentry, a circumstance which could have given rise to a setoff of the repurchase agreement funds by Hudson Valley, in much the same fashion as Citibank seized Chemical’s funds to secure its loan to Sentry, had the robbery of the racing receipts occurred while the repurchase agreement scheme was in effect.